Here ye, here ye, here ye, this Honorable Appellate Court for the Second Judicial District has now spoken for suit to adjournment. The Honorable Susan F. Hutchinson is idle. Good morning and please be seated. Good morning. Your Honor, this case will now proceed to 17-0207. Jack H. Edlston, defendant appellate. E. Thomas L. Hannah, Jr., defendant's appellate. Arguing along the gap between the plaintiff's appealant, Ms. Leslie J. Rosen. Arguing along the gap between the defendant's appellate, Mr. Daniel K. Muller. All right. Ms. Rosen, if you are ready, you may proceed. Thank you. Question of the letter. May it please the Court. I'm Leslie Rosen on behalf of the plaintiff appellant here. Pull that down closer. Thank you. Okay. As you know, this is a single-issue appeal, and it's whether the trial court erred in granting summary judgment to the TAP. In this case, involving inadequate security, or as my opponent will say, a bar fight. But it's a security case, and everybody agrees on the appropriate law here. The law is settled. There's a special relationship here between the business inviter and the business invitee. And accordingly, the defendant owed the plaintiff a duty for a criminal attack of a third party, if it was reasonably foreseeable that this could happen at the bar. Aren't there three doors for this particular establishment? Yes. And so are you saying there has to be security at all three doors? I never said that. Well, I'm asking how are we going to prevent it if we don't have it at all three doors? I'm not talking about carding people when they walk in. I'm talking about a bar that had security, that had grossly inadequate security. I'm not saying they need a bouncer at every door. I'm saying they need a security person to deter. That's what security does. Let's say that that's the case. How could it have been reasonably foreseeable that Calderon would leave the bar, go to his car, get a bat out and bring it back? That is not. That is not. I'm sorry. Please don't interrupt. I'm sorry. How could anybody have reasonably foreseen that some person who was not intoxicated, who had not been drinking, who had not been rowdy, who had not been pushy or chubby or anything of the kind, go out to his or her car and get a weapon and bring it back to inflict serious injury? That is not reasonably foreseeable. Perhaps as a matter of proximate cause, not as a matter of duty. My position is clear that had there been adequate security in the bar, it never would have proceeded to that point. It would have been stopped way before then. And, actually, my major point is that the court here saw this as reasonably foreseeable as a matter of duty, and it certainly is a matter of duty, but reasonable foreseeability is also an element of proximate cause. You agree, and you say in your pleadings that each case is determined on its own facts, correct? Absolutely. You also say in your reply brief that Getson v. Edifice Lounge would never stand today because it's 34 years old. Not just because it's 34 years old. I say it's 34 years old and nowhere, in no place would somebody allow, a bouncer allow somebody to come in with an open knife showing. That's the point. It's not just the age. Please. You say that in your briefs. You cite no case authority for it. You cite no case that's disagreed with Getson, correct? Correct. And, in fact, did you look to see whether or not Getson's been followed and cited repeatedly? No, I did not. But it has been. Okay. It's never been criticized. I'm criticizing it now, and you may do so, too, at your leisure. But the point is that the duty and the facts of Getson were much more egregious than the facts here, yet the 3rd District said there was no duty. In that case, that's what the 3rd District said in 1983 about a knife. I cannot imagine. And in that case, the people who were armed were the people who had been rowdy in the bar, correct? Correct. And here the person who inflicted the injury was not the person who had been rowdy in the bar, correct? Correct. I can't argue against the holding of Getson. I just think it's ludicrous. I can't walk into this courthouse with a knife. You can't go in an airport. Thirty-four years ago, you just walked on an airplane. It's a different day and time. I just don't think that it should be followed. You're not obligated to follow it. You agree that Calderon posed no threat to anybody while he was in the bar, correct? There was no indication that he posed a threat to anybody, correct? I will say that, but I don't believe that it would have happened. Actually, it's a continuing saga here, and as my point, it's very simple. And I didn't cite a case on it, but last night when I was rereading Davis v. All Hands, I looked at the cases all cited in there, and if you look at the Lucht case, which is cited in Davis v. All Hands, it's also a third district case, two years earlier, also written by Justice Cook, but with a different result. There they talk about a continuing situation. This was a continuing situation. It wouldn't have started. I don't know what Calderon would have done, but I think that's a question for the jury. That's a fact question. That's my position. Mr. Calderon, if I have the facts correct, Mr. Calderon walks out of the bar and goes to his car. He doesn't carry the bat into the bar. He apparently goes and gets it from his car. So if there had been security, they would have seen him leave. What would they have done? Well, I don't know if they would have seen him leave, and I don't know when he got the bat. I don't believe there's evidence on that point. My understanding is the wife said when they went to the house that she kept a slugger, a Louisville slugger in her car, and it wasn't there, and I think that that's what hit him because the force that hit this guy in the head was very extreme. I don't think that I know. I know I don't know the complete facts about that. I highly doubt he walked in with a bat. Nobody would have a reason to do something about that like that, but I don't know. Are you saying it's almost like a theory of accountability?  Are you arguing it's almost like a theory of accountability? Like because Calderon was with this group, with Hannah, and Hannah was rowdy and they were all rowdy, then therefore Calderon's behavior should have been watched more closely? I'm saying that they were all cut off, and they were all drinking. The facts are in dispute about how much they were drinking, somewhere between five and ten shots of vodka and five and ten four-ounce shots, four-and-a-half-ounce shots and beer. They were all cut off, and they should have all been asked to leave earlier. When Harry Furman was watching the bar, she was the security at the bar. She would have asked them to leave. She knew they were rowdy. She stayed later to kind of watch the situation. She told the other two bartenders, watch these guys. They said, we got it. You're not working. She was the security. This was a bar that had security, and she'd been there. And prior to that, the bar owner used to provide security. So I'm saying it wouldn't have happened. That's what security is about. Are you saying that a bar, any bar, must have security guards? No. I didn't say that. I'm saying that this bar, which is a neighborhood bar that's known to have about one fight a week, one argument a week, one argument. Arguments are not fights. Correct. Arguments are commonplace here. People argue. People argue everywhere. Here, nobody's drinking during the day. People raise their voices. That does not require security. I agree. But you know what? Somebody had their teeth knocked out at this bar, too. Would you agree that where an injury results from freakish, bizarre, or fantastic circumstances, there is no duty? Not necessarily. And I would. Isn't that boilerplate, black-letter law? Well, it depends. Isn't it? No. I would not concede that. If you look at Zoprebov, which is the case I cited, and it was my case, that was a case that was as freakish as you could ever get. That was a flying body part. A young kid thought that the train was going to stop. His girlfriend was going to get off the train, so he ran in front of it. He's smiling at the engineer who can't stop. He gets hit. His body parts go flying, and he hits somebody 100 feet. One of his body parts hit somebody 100 feet down the track, her shoulder and her leg. That's as freakish as you get. But that's not the issue. The issue is we're talking about a bar fight. Well, we're talking about a bar fight. Not a train accident. And the requirement for security and for the actions that are taken are dependent upon the facts of each case. Yes. Okay. And you know what? In the Davis v. Allhans case, which is the primary case that the defendant relies on, that was not summary judgment. That was after a trial. This is a case where there's plenty here. You can't confuse the duty and the approximate cause issues of foreseeability. But do you have a single case that discusses, as Justice Shostak alluded to, this seems to be the argument, the bar, because they saw Hannah's behavior, should have taken steps to protect conduct by somebody else who was not acting out of the ordinary. Yes. I don't have a case. But I'm saying the Lutz case says if they had stopped him from drinking and said, you've got to go, called him over to the left, he would have been there. That's for the jury to decide if that's reasonably foreseeable or if it was a breach at that point. The question is, do you have a case that says that, that you have to take steps to protect? I mean, if they had excluded Hannah, this wouldn't have happened. That's your point. That's my point. That's exactly my point. There's no reason to think it would have happened and the jury could decide that issue, but it should be the jury. Do you have a case that requires a bar establishment to kick somebody out of a bar where he hasn't engaged in any violence? Mr. Hannah had been aggressive and rowdy. He was saying to people. He was rowdy and mouthy. Right. Where was he? What can you cite to in the record that he was aggressive towards people, that he used any physical violence against anybody? No physical violence, but rowdy and aggressive, yes. And where's that going from there? There's no. He wasn't. Where's the aggressive? He's saying to people. What made him say he was aggressive? His wording. His wording. What you looking at? It wasn't like, oh, are you watching Downton Abbey? It's what you looking at. That's aggressive. Those can be deemed fighting words. Carrie Furman, the one bartender who was the manager, deemed those problematic. She thought he should be, if she had seen more, she wanted him out, but she wasn't in charge. The bar knew it needed security. This occurrence. It's a continuing situation. It's a continuing problem. If Hannah had been evicted, most likely Calderon would have left with him. Okay. This occurrence occurred outside somewhere on the perimeter of this bar. In the parking lot, outside. Let's take your scenario, and they do say, Mr. Hannah, the two bartenders there say, Mr. Hannah and your group, thank you for your business tonight. You're out of here. So they leave. Mr. Calderon hasn't been drinking a lot in the bar. He hasn't been outstanding in terms of conduct. He hasn't been outrageous. We really don't know much about him. But now they're thrown out. And they go out into the parking lot. Isn't it just as reasonable to believe that after being thrown out they would be angry and they could wait in the parking lot for the first person out the door, who in this case happened to be Mr. Elston? Well, we don't know if he was the first person out the door. We don't really know anything about that. But that is a question of approximate cost, not of duty. They have a duty to provide security when they know they have a problem. They know they had a problem. You want security somewhere in the facility. To cover your circumstance, to cover your scenario, you would need security every place on that parking lot until they get to the right-of-way of the street. No, I don't think so. Carrie Furman said when she was in charge, she walked the bar, she walked through it, she walked in the parking lot, she provided security, she provided deterrence. The problem here is that Carrie Furman should not have been the security. That was the inadequate part of it. This bar owner knew. He provided security until he bought a second bar four months earlier, and he stopped being there. The other guy, Joe, the cook, also provided security. They knew they needed security. And the whole idea of security is to deter. And I know my opposing counsel said you shouldn't pay attention to the little piece I put in my appendix about what security does, but there's plenty of case law. On that point, there was no judicial notice of that document, was there? No, it wasn't. I just applied it. And you did not ask us to take judicial notice of it, correct? There was no motion filed to ask us to take judicial notice of it, correct? Correct. I've never in my career asked to take judicial notice on appeal of anything. Nobody's ever said anything about that. Is that just something you put in the record? I didn't put it in the record. I put it in my appendix. That's not the record. Was it in the record down below? No, but there's case law, plenty of it, that says judges don't have to leave their common sense at home. People v. Gacy is one of them. Well, you don't have to provide the common sense for us. We have our own rights. Right. I'm just saying that without our permission, it's not a good idea. I'm sorry. I won't do that again. But I consider that common sense that that's what security is, is deterrence. Our expert, Mr. Decker, talked about, you know, deterrence. It's in the record that that's what security does. It's deterrent. And that's the major, my understanding is that's what security does. That's what Carrie did. Carrie walked the bar, and then she went outside. And to have a bar where you think not only that your bartender is the first line, but that your patrons are the second line is ludicrous. Your client testified that he always felt safe in that bar, and he'd been there hundreds of times. Doesn't that contradict your theory of the case, that this is a rowdy bar where there's fights all the time? First of all, that's a fact that goes to proximate cause, too. No, contradicted is contradictory. Yes, but my client has brain damage. Let me finish the question. Doesn't that contradict your theory that there is a duty here because it's a rowdy bar? It's an admission by your client that in his opinion it was a safe bar. That's his opinion. He always felt safe. My client has brain damage. My client, his brains were out of his head. He's got severe brain damage. It's a factor to consider. Yes, in effect it's contradictory. Okay. Please. Sorry. I was answering. Would you agree that that contradicts your theory? I said yes. Okay. It also contradicts my theory that the police officer said that it was a fine bar. But those are fact questions to me. That is not a duty question. All right. The time has expired. You will have an opportunity for rebuttal or response if you choose. Thank you. I'm sorry, Your Honor. I'm too excited. Okay. The argument is welcome. He's as passionate as you are, sir. Okay. Okay. Mr. Mullen. Good morning, Your Honors. Counsel. May it please the Court. I'm Danny Mullen, and I represent the defendant Eppley Latham Tapp. And before I lodge into my argument, I'd like to respond to some of the questions of the panel. Mr. Mullen, because you're taller, would you pull that microphone up? There we go. Very good, Your Honor. I think the Court has highlighted the exact issues that are in play in this case, that at no point in time did the Latham Tapp have any notice that Joe Calderon was going to wield a bat outside of its bar and hit Jack Elston in the head. I think the Court has asked it. My opposing counsel, is there any case that says that you can impute the conduct of one another and there isn't case to that effect. There is case law that I cited, Yangus, for the opposite proposition, that you specifically cannot impute the conduct of one companion to another companion. But what is the ultimate responsibility of this bar with reference to its invitees? Certainly. The general duty is that they don't owe a duty. They're not an insurer of the patron's safety. They don't owe a duty unless it is reasonably foreseeable that a fight is likely to occur. And under the circumstances of this case, the undisputed record is that nobody expected that. The three Latham Tapp employees that were on the premises, no one was aware. No one was aware of what? That a fight was imminent or going to be occurring. They had actual knowledge of how loud and aggressive this guy became. Yes, they are. Correct. The undisputed facts are that the bartenders that were behind the bar that were serving drinks identified and had an eye on Mr. Hanna. They observed bad conduct. They cut him off and watched him. They cut him off. Exactly, Your Honor. They cut him off, they watched him, and they warned him. And they said, if you kick this up, we're going to kick you out. And they didn't kick it out. And Trish Starr, I think it's her deposition where she outlines it. I've cited it in my materials. I don't have it immediately available to me. But I believe it's at the supplement record 300 through 305 where she talks about cutting him off, warning him, and that if he didn't curb his behavior, he was going to be gone. And your position is that those steps were reasonable to prevent the fight? It is, Your Honor. But a fight did happen. The first fight happened. And the plaintiff's argument is that it wasn't enough, that that was not enough, because Hanna got involved in fighting words with Elston. They fought. Mr. Elston got the upper hand, which then led to Calderon leaving, getting the bat, and inflicting almost, you know, life-ending injuries. That's correct, Your Honor. There was no communication or interaction between Mr. Elston and Mr. Hanna or Mr. Calderon or Mr. Calderon and Mr. Hanna and any of Mr. Elston's friends that occurred within the bar. The court has alluded to this sort of generic rowdy or mouthiness of what are you looking at. The record indicates Mr. Cooper's testimony is that Mr. Calderon had a colostomy bag. It's not clear whether he perceived people looking at his colostomy bag, whether he was self-conscious about it. But regardless, the undisputed facts are that he said that. None of that was directed at the plaintiff. None of that was directed at the plaintiff's friends. The first communication or interaction between the plaintiff and Mr. Hanna occurred in this breezeway, out of view from anyone, and Mr. Hanna's conduct before that, none of it indicated that a fight was imminent or going to be occurring. There was no actual knowledge of Mr. Hanna's violent propensities at any point in time. And if the court is going to impose a duty in this case, simply because somebody is intoxicated and maybe loud or vaguely rude or otherwise mouthy, there would be a duty in every case. And I think the trial court appropriately noted that the magnitude of that burden on every local neighborhood corner bar is just simply unreasonable, that that duty and not only the magnitude of the duty, but then the consequence of that duty, that if you see somebody who's intoxicated and mouthy, then you put them out on the street. And the consequence of that duty is that you are perhaps endangering the motoring public. So perhaps the most reasonable thing to do is what Latham Tapp did in this circumstance, monitor their bar, watch what they were serving people. When they perceived that somebody had been served too much, they cut them off. They warned them when they observed their conduct to be perhaps out of line, and they told them if you do this again or you keep this up, you're going to be kicked out. That's the reasonable course of conduct in this circumstance. Mr. Maughan, why wouldn't these questions be issues for the trier of fact? Your opponent brings up that it was a proximate cause, whether or not the reasonable foreseeability. Why wouldn't this be an issue for a trier of fact? Well, on undisputed facts, whether a duty exists is a question of law. That was something that the trial court was referring to. But the facts are a bit disputed, aren't they? I don't believe so. I don't think that there's anything in the record. I'm married to the record. I'm married to what the deposition transcripts say, and I'd be happy to have the court read anything in the record. And if the court has questions about specific facts. You're not contesting anything about the facts. I'm not. We're not, Your Honors. And you can take anything in there. And you take them in the light most reasonable to Mr. Elson. And the fact is that under the facts, however you interpret them, there was nothing that put Latham Tapp on notice that there was going to be a fight. There was nothing. And certainly there was nothing that put Latham Tapp on notice that Mr. Calderon, who there is no evidence of his intoxication even, let alone rowdiness or mouthiness or anything of the sort, that he was going to then leave the bar, grab a baseball bat out of his car, and hit Mr. Elson in the head outside of the bar. There's nothing like this that had ever happened at Latham Tapp in its history. With reasonable foreseeability, you don't have to reasonably foresee the exact facts that may happen to cause an injury, do you? No, you don't. But you do need something to cause that reasonable foreseeability to exist. And reasonable foreseeability in this context means that it is likely to occur. There is nothing in this record that suggests that what happened was likely to occur. We have, both counsel have called this a neighborhood bar, and I think probably it was called a neighborhood bar also at the trial court. Yes. Not like a Cheers neighborhood bar. No, not quite that happy. Evidently not. But the Hanna Group was not part of the regular clientele, was it? They were not. Does that add something to this particular circumstance that isn't in some of the others? I don't believe so, Your Honor. And I should mention, with respect to the Hanna Group, Hanna and Calderon have been lumped together, of course. Hanna didn't arrive with Calderon. Hanna arrived with Cooper, and then Cooper left. Calderon came later. So we're sort of assuming that everyone knew that Hanna and Calderon were affiliated or associated with one another. That's an inference that the plaintiff wants drawn from the facts that I'm not disputing for purposes of appeal. But to say that they were a group, I think, is a little different. Were Hanna, Cooper, or Calderon the neighborhood guys who would come in? They weren't regulars. That's a fair point. And I don't think that that militates towards a duty existing in this case. In fact, quite the contrary. Based on cases that say when a duty arises, you need to have actual knowledge of the violent propensities of the person if you're going to impose a duty such as ejecting them from the bar or barring them from the bar in the first instance. And their status as non-regulars or people with whom the length of time employees are not familiar actually supports my position rather than hinders my position because it's a blank slate. It's always conceivable that a fight is going to break out. Anything is possible. Just because it's conceivable doesn't mean it's foreseeable, correct? Exactly. And that's the distinction. But here you did have Mr. Hanna's behavior was, would you agree, out of the ordinary and he was cut off? Yes, there's no dispute as to that. And I think when you're looking at either whether there's a duty to hire extra security, you look at the conduct of the bar, I don't think the record is any worse, certainly not worse, than Davis v. All Hands or Davis v. Mealy where there seemed to, in Davis there was four fights in 90 days. In Mealy v. Pittman there was five calls to police in six months, including a big brawl that happened just a month before the accident. We have nothing of the sort. The record contains, you know, responses that the police made to the Latham Tap over the period of years. There's testimony generically of, you know, people would argue, and as Your Honor pointed out, arguments and verbal arguments are different than physical fights, and physical fights were far less common. Carrie Furman, who the plaintiff's counsel has articulated was sort of the enforcer or the security there when she worked, she testified that these types of circumstances were rare. She called the police one time in eight years of her employment there. So we don't have the factual predicate, I think, to warrant the imposition of a duty on the part of Latham Tap in this instance. You rely on the Lutz case, but really Lutz can be distinguished, can't there? I mean, that's a totally, I mean, it's not totally different, but there was no evidence that there was any, that this attacker was intoxicated, you know, had been warned about it, been warned before. You know, nobody had their eye on him. So that's a kind of different set of facts, much kinder, gentler set of facts. It was a dance and he bumped into somebody. Right. Respectfully, Your Honor, I don't know that I do rely on Lutz. Certainly it's a case that's been cited in the materials. I think plaintiff's counsel in their reply brief cites it in support of its position, even though the outcome is in my favor. And opposing counsel has said, well, the facts in Lutz didn't impose a duty, but our facts are different than that. I think that's just a false rhetoric. I think the court needs to look at Davis v. Allhands. That's really the controlling case here. Davis, that court in Davis went through sort of the history and progeny of both these cases and sort of synthesized all of what the law is in this area. And I think that would have been what this court, we would have been asking this court to do had the court in Davis v. Allhands not already done it. Everything I think that the court needs to decide in this case is really governed by that, those cases and that facts. Do you agree with counsel that Getson v. Edifice Law would never stand today? You know, I've researched that. I saw that in the brief. I thought to myself, well, has it ever been overturned? Has it ever been cited without, you know, with disfavor, and I haven't found anything. You know, there's issues with... In that case, the individuals, the gang members were visibly armed when they entered the bar. That's right. And the only action taken by the bar was to tell them to take off the gang jackets. Right, exactly. And that was held to be reasonable. It was. And so certainly, I think to Your Honor's point, our case doesn't come close to the facts in Getson. And if Getson is still good law, which I believe it is, we don't approach it. And beyond that, it goes to the underlying general nature in this area, which is unless you have a specific reason to know that a fight is imminent or going to be occurring or that a particular person is problematic, there's no duty to it that it doesn't exist. The reasonable foreseeability, the likelihood of harm just isn't there. But isn't there a question as to whether or not this man was going to be a problem? On these facts, I don't believe so. You know, so that's where my question comes in with respect to summary judgment. I mean, I think all trial court judges are different in summary judgment, granting summary judgment. And I'm just questioning if that is the issue for the trial fact. Is it not? Was this guy perceived as a problem? And I think that there is. Isn't there a lot of facts that could be maybe you don't dispute them and say, no, in my opinion, the trial court made the right ruling by saying these facts weren't an issue. These are the facts. I like the facts. These are them. But aren't these the facts that the trial fact should look at and say, should they have perceived this man to be a problem? I don't believe so, Your Honor. And I can, I think, hopefully calm your concern with, one, this duty analysis all is prospective looking rather than with the benefit of hindsight. But beyond that, the Davis v. Allhans case, which the trial court quoted at length in its memorandum and opinion granting our motion for personal summary judgment on the negligence count, it compared the facts of our case to the facts of the Davis case. And it said basically, the trial court did, that our facts at worst are the same as Davis. In that case, Allhans, who was the perpetrator, he was intoxicated. He gave the bartender the middle finger. He threw his wallet at the bartender. He became loud and obnoxious at the pool table, started using profane language. All of those things, all of those facts were at issue in Davis, and the court said, even under those facts, absent something else, there is no duty. And so to Your Honor's question, to answer that more directly, assuming that Mr. Hanna was intoxicated, assuming that Mr. Hanna had been generically rowdy or had made vague sort of rhetorical questions, what are you looking at, to people that weren't the plaintiff or the plaintiff's group of friends, had been told to knock it off and then was monitored, I think the court can rest assured that the trial court made the correct decision here and that it's not one for the jury to decide based on hindsight. It's a question of law for the court to decide whether the conduct and the facts in this case raise to the level where it's reasonably likely that a fight is going to occur, and the undisputed record, I think, doesn't exist for that type of finding. Davis case was not a summary judgment case. Correct, it was not. It came up on a different posture than the case before you, but I don't know that the procedural posture of the case has any effect or limiting effect on its application. Whether those facts would support an argument that a duty exists. Right, and I don't know enough about the Davis procedural posture, whether the defendant in that case moved for summary judgment like we did, or partial summary judgment, I should say. But it went to trial. It did go to trial, and the plaintiff was at duty. The issue of duty apparently wasn't articulated. The jury returned a verdict for the plaintiff, and the court of appeals said, no, based on the undisputed facts, there is no duty under the circumstance of this case, and the facts of that case are, as the trial court put it, at worst, are facts of the same. In that case, the assault occurred in the bar. It did occur in the bar, that's true, which I think makes it even less likely that there should be a duty imposed in this case. There is a body of law that suggests that once outside the bar, no duty exists. That's correct. There's also a few cases that say otherwise. There is exceptions to that rule where the incident begins in the bar and then flows out, or as in Osborne, where the two rowdy patrons are excluded from the bar and the bar takes no steps. They just move their problem outside. Right, there is a line of cases, and we haven't tried to make the distinction that simply because it happened outside, therefore, all of our obligation is off. That's not my position, although I do acknowledge there is a line of cases that would support an argument to that effect. I understand my time is up. I'm happy to answer any other questions the panel has. Thank you, counsel. Thank you, Your Honors. Ms. Rosen, would you pull the microphone back down? Okay. Thank you. Justice Burkett had a great line, conceivable is not the same as foreseeable. I agree completely, but that's not my theory here, that it was just conceivable. It's conceivable a fight could break out in my house with my brother-in-law, but I don't have to have security. We understand. Your point is the bar should have been focused on Hannah like a laser and watched him, and they didn't. Correct? Is that essentially your argument? That they had enough to evict him, and actually the night before he had been problematic as well. And the bartenders were drinking with him. There's evidence that the bartenders were actually drinking with him. This is not appropriate behavior when your bartenders are your first line of security. But evicting Mr. Hannah is not going to solve the Calderon problem, because if they just say, Hannah, you're out of here, who wants to say Calderon is going to leave? If Hannah had been kicked out of there before this fight ever ensued, there would have been no reason for Mr. Calderon to go to his car, get a bat, and hit Mr. Elston. And there's no reason Mr. Elston would have been outside of the bar. He was in the bar. This was his place where he was hanging out. He walked out of the bar when he pushed Mr. Hannah after Mr. Hannah had punched him. It was a continuing saga. It started in the bar. So nothing would have been happening outside the bar necessarily. I mean, that's a fact question. No one saw the fight, correct? Correct. But some of it was on video. Again, that's hindsight. You say in your brief without any citation for this argument that, quote, had the breezeway door been open and the music not been so loud, and a security guard and or a TAP employee could have seen the fight and stopped it before it became so dangerous to Elston. So they would have had to, on your theory, turn the music down, keep that door open, and have a security guard watching. I have authority. It's not without authority. The testimony is both from Carrie Furman. I meant citation to a case. Yes, but there is authority. Carrie Furman said if she had been in charge that night, the music would have been lower because she saw that as a problem. The door would have been open because she saw that as a problem. And Mr. Dexter also said those things made a difference. So that creates a duty then to keep the door open, turn the music down. I'm not saying that that had to be done specifically. I'm saying that had they had security, it was inadequate, and a jury should decide if that was foreseeable, that this would have happened in light of that. The duty is there. They acknowledged the duty by having the security they had, which was their bartender and their patrons. As to Davis, of course there's one appellate court, but you don't have to follow it if you think it's controlling you. I mean, you can go with it, but you don't have to if you think it was wrongly decided. I think it was wrongly decided, and it did go to trial. So I don't know if there would have been a summary judgment, but that is different. Well, but it went to trial. The facts were all there, and the appellate court and a jury who could have been emotionally charged by the facts and circumstances of Davis said plaintiff, you win. The appellate court said, no, we have to follow the law, and the law says X, Y, Z, and you're wrong. Here they can use that to apply to these facts. I agree. I understand that, but I'm saying that at a trial, these are depositions. At a trial there could be more facts, and here there's enough. I think there is a duty, so you might see a different story. It might even be worse now because so much time is passing, but there might be more. Your point is that we're not bound by Davis. You're not bound by Davis. To say that this was just a bar and it was no means like Cheers, there had been police calls, not too many, but somebody had had all their teeth knocked out. That's not nothing. I mean, that's something. And also Kerry had stopped somebody from snorting cocaine in the bathroom, and they knew they needed it. The owner said he provided it. So it wasn't just that there might be trouble. There was evidence that there was going to be trouble. Cooper left because he thought there was going to be trouble. There's another guy, Mengelt, who thought there was going to be trouble. And this was a bar that had property crime. And when you have property crime, you're likely to have more crime, according to my expert. So with that, unless you have any questions, I'm done. Thank you so much. Thank you. Thank you for your argument this morning. We will take the matter under advisement. We will issue a decision accordingly, and we are going to stand in recess to prepare for our next argument. Thank you.